# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| BRADFORD SCOTT WICKS, )<br>　　　　Plaintiff, )<br>　　　　　　　　　　　　　　　　)<br>　v.　　　　　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>NANCY A. BERRYHILL, )<br>Acting Commissioner of the )<br>Social Security Administration, )<br>　　　　Defendant. ) | CAUSE NO. 4:17-CV-11-JEM |

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Bradford Scott Wicks on January 26, 2017, and Plaintiff's Opening Brief [DE 16], filed by Plaintiff on August 18, 2017. Plaintiff requests that the decision of the Administrative Law Judge be reversed or remanded for further proceedings. On August 18, 2017, the Commissioner filed a response, and Plaintiff filed a reply on September 1, 2017. For the following reasons, the Court grants Plaintiff's request for remand.

## I.　Procedural Background

On September 10, 2013, Plaintiff filed an application for benefits alleging that he became disabled on June 16, 2013. Plaintiff's application was denied initially and upon reconsideration. On December 18, 2015, Administrative Law Judge ("ALJ") Theodore W. Grippo held a hearing at which Plaintiff, with an attorney, and a vocational expert ("VE") testified. On December 23, 2015, the ALJ issued a decision finding that Plaintiff was not disabled.

The ALJ made the following findings under the required five-step analysis:

1.　The claimant met the insured status of the Social Security Act through December 31, 2017.

2.　The claimant did not engage in substantial gainful activity during the period

from his alleged onset date of June 16, 2013, to the date of the ALJ's opinion.

3. The claimant had the severe impairment of degenerative disc disease.

4. The claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one the listed impairments in 20 CFR 404, Subpart P, Appendix 1.

5. The claimant had the residual functional capacity to perform light work, except that he could climb, balance, stoop, kneel, crouch, and crawl only frequently, and could not have concentrated exposure to vibrations.

6. The claimant was unable to perform any past relevant work.

7. The claimant was a younger individual age 18-49 on the alleged onset date.

8. The claimant has a limited education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not he has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could perform,

11. The claimant was not under a disability, as defined in the Social Security Act, from the alleged onset date through the date of the ALJ's decision.

On November 29, 2016, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**II.   Facts**

In June 2013, Plaintiff injured his neck and back while lifting a truck tire at work. Since then, he has reported pain in multiple areas of his back, with pain radiating down into his legs. CT scans and X-rays revealed compression fractures in three thoracic vertebrae and one lumbar vertebra, degenerative changes, and disc bulging in his lumbar spine. Electromagnetic nerve testing also confirmed the presence of chronic denervation (loss of nerve function) of the paraspinal muscles, lumbar radiculopathy, and mild carpal tunnel syndrome. Starting in April 2014, Plaintiff had monthly appointments with neurologist Julian Ungar-Sargon, M.D. ("Dr. Ungar"), who treated Plaintiff's conditions with injections and prescribed medications, physical therapy, an orthopedic bracing TENS unit, and hot/cold packs. Plaintiff also has hypertension, obesity, and some hearing loss.

In a medical source statement dated February 16, 2016, Dr. Ungar opined that, due to pain, Plaintiff was unable to walk more than a block, sit for more than 45 minutes, or stand for more than 30 minutes at a time; that he would need a job that permitted him to shift at will between sitting, standing, and walking; and that he could sit for less than two hours and stand/walk for less than two hours in a work day. In a letter dated July 28, 2015, Dr. Ungar summarized Plaintiff's history of pain, compression fractures, disc bulging, lumbar radiculopathy, and degenerative disc disease. Dr. Ungar described the results of Plaintiff's scans and physical exam findings, related his treatment of Plaintiff, and confirmed that he had reviewed Plaintiff's prior medical records. He then opined that Plaintiff had "persistent" and "incapacitating" pain, could "work for a maximum of 2 hours a day with repeated breaks to get up and limber to reduce some of the spasm;" could carry anything up to 10 pounds and could push or pull up to 5 pounds; could bend, squat, and kneel occasionally but could not climb or twist at all; and could no longer work full time. He also opined that Plaintiff met

"Listing 1.03 for neck, thoracic, and lumbar spine."[1] On August 17, 2015, Dr. Ungar signed a Questionnaire which contained the criteria for Listing 1.04, Disorders of the Spine. On the Questionnaire, the doctor checked boxes indicating both that Plaintiff met the listing, and, that if he did not meet the listing, he equaled the listing, for disorders of the spine. Plaintiff's attorney argued that this document was meant to clarify the doctor's earlier mistaken use of the wrong listing number in his narrative letter.

On September 30, 2013, consulting psychologist Chad A. Pulver, Ph.D. performed a mental status exam of Plaintiff and assessed him with social anxiety disorder and anxiety centered on performing his duties at work. On October 1, 2013, reviewing consultant Ann Lovko, Ph.D. reviewed the evidence provided by Dr. Wicks and opined that Plaintiff had moderate difficulties with maintaining social functioning, which would cause moderate limitations in the following work-related activities: interacting appropriately with the general public, accepting instruction, responding appropriately to criticism from supervisors, getting along with coworkers and peers, and maintaining socially appropriate behavior. She noted that Plaintiff appeared able to relate on at least a superficial, ongoing basis with coworkers and supervisors. On December 6, 2013, another reviewing consultant, Donna Unversaw, Ph.D., agreed with Dr. Lovko's assessments of Plaintiff's mental limitations.

## III. Standard of Review

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will

---

[1] The correct listing number for disorders of the spine is Listing 1.04. Listing 1.03 is not relevant to Plaintiff's case.

reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "A reversal and remand may be required, however, if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions.*" Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citations omitted).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing

5

court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## IV. Analysis

Plaintiff argues that the ALJ erred in finding that he did not meet or equal the listing for disorders of the spine, and that he failed to provide support for his listing analysis and his RFC analysis because he did not properly weigh the opinion of Plaintiff's treating physician, omitted any mental limitations from the RFC, and erred in evaluating Plaintiff's testimony.

Plaintiff first argues that the ALJ erred in failing to give controlling weight to Dr. Ungar's opinion that Plaintiff met or equaled a listing. Listing 1.04, Disorders of the Spine, can include a variety of conditions, including the degenerative disc disease and vertebral fractures evident in Plaintiff's medical history. However, to meet listings level, a patient must also have the characteristics described in Sub-listing A, B, or C. Sub-listing A[2] entails:

> Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . *accompanied by sensory or reflex loss, and,* if there is involvement of the lower back, positive straight-leg raising test.

20 C.F.R. pt. 404, Subpt. P, App. 1, Listing 1.04(A) (emphasis added). All of the characteristics must be met in order for the claimant's disorder to meet the listing.

---

[2] Sub-listings B and C describe conditions that do not appear relevant to Plaintiff's case.

At step three of his analysis, the ALJ stated that Dr. Ungar's reports of normal reflexes, sensory and cerebral testing, and strength showed that Plaintiff did not meet Listing 1.04.A. The ALJ also stated that he gave "very little weight" to Dr. Ungar's opinion that Plaintiff met or equaled the listing because of the inconsistency in the fact that Dr. Ungar checked two boxes, one indicating that Plaintiff's impairments "met" the listing and one indicating that they did not meet but "equaled" the listing. As further evidence of inconsistency, the ALJ noted that the doctor had checked boxes that said Plaintiff could "occasionally" twist, then in his later narrative report wrote that "cannot climb or twist at all." Plaintiff argues that the alleged inconsistencies are minor and may be attributed to Dr. Ungar's lack of close familiarity with Social Security regulations and to his use of ordinary language, rather than Social-Security defined terms, in his narrative report. Plaintiff asserts that, whether or not Plaintiff "met" the listing, the ALJ did not adequately consider whether his combined impairments "equaled" the listing.

The ALJ's analysis of whether Plaintiff's impairments equaled a listing ignored substantial portions of the medical record. In analyzing Plaintiff's severe impairments, the ALJ found that Plaintiff had the severe impairment of degenerative disc disease. He next discussed Plaintiff's hypertension, hearing loss, carpal tunnel syndrome, and mental impairments, finding that those conditions were nonsevere. In that discussion, the ALJ omitted any reference to Plaintiff's vertebral compression fractures. Dorland's medical dictionary defines compression fracture, or axial compression fracture, as a "fracture of a vertebra by excessive vertical force [which] usually occurs in the thoracic or lumbar region," which might suggest a condition due to injury or trauma. Fracture, Dorland's Medical Dictionary, https://www.dorlands.com/dorlands/def.jsp?id=100042469 (last visited 2/21/2018). It is possible that the ALJ considered vertebral fractures when he considered

7

Plaintiff's degenerative disc disease, but if so, he did not reveal that he did so or illuminate his reasoning as to why he conflated the two conditions. Notably, in Dr. Ungar's narrative description of Plaintiff's medical history, the doctor addressed Plaintiff's workplace injury and compression fractures first. In a separate paragraph, the doctor then wrote that Plaintiff "has had cataracts in the past and a longstanding history of degenerative discogenic disease." The ALJ's omission of any discussion of compression fractures at either step two or three leaves the Court unable to discern whether he considered that impairment when determining that Plaintiff's combined impairments are not equivalent to a listing.

Plaintiff also argues that the ALJ erred in giving "very little weight" to Dr. Ungar's opinions about Plaintiff's limitations in assessing his RFC. The Commissioner argues that the ALJ properly gave but little weight to Dr. Ungar's opinions because they were internally inconsistent and inconsistent with other evidence in the record.

"A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Gudgel*, 345 F.3d at 470 (citing 20 C.F.R. § 404.1527(d)(2)); *see also Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). Being "not inconsistent" does not require that opinion be supported directly by all of the other evidence "as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." S.S.R. 96–2p, 1996 WL 374188, at *3 (July 2, 1996). To be "substantial," conflicting evidence "need only be such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*; *see also Schmidt v. Barnhart*, 395 F.3d at 744. In particular, an ALJ may not simply ignore an opinion that addresses a plaintiff's ability to work, but must "evaluate all the

evidence in the case record to determine the extent to which the opinion is supported by the record." S.S.R. 96–5p, 1996 WL 374183, at *3, *5 (July 2, 1996); *see also Hamilton v. Colvin*, 525 F. App'x 433, 439 (7th Cir. 2013) ("While the ALJ is right that the ultimate question of disability is reserved to the Commissioner, a treating physician's opinion that a claimant is disabled 'must not be disregarded.'") (quoting S.S.R. 96–5p) (citing 20 C.F.R. § 416.927(e)(2)); *Roddy*, 705 F.3d at 636 ("Even though the ALJ was not required to give [the treating physician]'s opinion [that the claimant could not handle a full-time job] controlling weight, he was required to provide a sound explanation for his decision to reject it.").

The RFC is an assessment of what work-related activities the claimant can perform despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004); *see also* 20 C.F.R. §§ 404.1545(a)(1); 416.1545(a)(1). In evaluating a claimant's RFC, an ALJ is expected to take into consideration all of the relevant evidence, including both medical and non-medical evidence. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3). According to SSA regulations, the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. S.S.R. 96–8p at *7.

Although an ALJ is not required to discuss every piece of evidence, he must consider all of

the evidence that is relevant to the disability determination and provide enough analysis in his decision to permit meaningful judicial review. *Clifford*, 227 F.3d at 871 (7th Cir. 2000); *Young*, 362 F.3d at 1000. In other words, the ALJ must build an "accurate and logical bridge from the evidence to his conclusion." *Scott*, 297 F.3d at 595 (quoting *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002)).

In assessing Plaintiff's RFC, the ALJ gave "very little weight" to Dr. Ungar's opinions regarding Plaintiff's functional limitations. The ALJ found that Dr. Ungar's opinions were "wholly inconsistent with the objective medical evidence, including multiple tests . . . that showed normal or only mild findings." Because he characterized the physical findings in Plaintiff's medical records as "normal" and "mild," he rejected Dr. Ungar's assessment of Plaintiff's functional limitations. But the ALJ made a logical leap in assuming that those findings, including CT scans and X-rays showing "mild to moderate" fractures in four of Plaintiff's vertebrae, cannot cause severe impairment. Furthermore, contrary to the ALJ's characterization, Dr. Ungar's initial physical of exam of Plaintiff revealed positive findings for every test of Plaintiff's hips (Hawkins, Thomas, Trendelenberg, and Faber tests), as well as restricted ranges of motion in the shoulders, neck hypertonicity (tension of the muscles) with spasms and tenderness, thoracic tenderness, and a positive straight leg raise test. Later examinations revealed additional abnormalities in Plaintiff's shoulders, together with additional hypertonicity, spasms and tenderness in the thoracic spine. The ALJ does not adequately explain why those findings, together with scans showing compression fractures and other abnormalities in Plaintiff's spine, are inconsistent with Dr. Ungar's opinions.

In assessing the medical evidence, the ALJ also characterized Plaintiff's course of treatment as "conservative" and found significance in the 10-month gap in treatment between the Plaintiff's

10

injury in June 2013 and his starting treatment in April 2014. However, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." SSR 96-7p, 1996 WL 374184 at *7 (July 2, 1996); *see also Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("[A]n ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference . . . The claimant's 'good reason' may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects"). As to Plaintiff's "conservative" treatments, the record shows that Plaintiff pursued physical therapy, injections, an orthopedic bracing TENS unit, heat/ice, and both narcotic and non-narcotic painkillers. The ALJ pointed to no evidence that any other treatment was recommended for Plaintiff's conditions or available to Plaintiff. As to the 10-month delay in seeking treatment, Plaintiff explained that he had no insurance during that period, and that he started treatment with Dr. Ungar as soon as he had insurance. The ALJ erred in drawing a negative conclusion from Plaintiff's 10-month delay in seeking treatment without discussing Plaintiff's stated reason for the delay.

Moreover, even if an ALJ declines to give a treating source's opinion controlling weight, he must still determine what weight to give it according to the following factors: the length, nature, and extent of the physician's treatment relationship with the claimant; whether the physician's opinions were sufficiently supported; how consistent the opinion is with the record as a whole; whether the physician specializes in the medical conditions at issue; and other factors, such as the amount of understanding of the disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with other information in the claimant's case. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(6); *see also* 20 C.F.R. § 404.1527(a)(2)(c)(2)(ii)(5) (an ALJ is required

to grant more weight to a treating specialists when the medical issue is related to their area of expertise ); *see also* 20 C.F.R. § 404.1527(c)(2)(ii)(5) (an ALJ is required to consider the length, nature, and extent of a treating providers relationship with the plaintiff and the frequency of his examinations). "[W]henever an ALJ . . . reject[s] a treating source's opinion, a sound explanation must be given for that decision." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). In weighing Dr. Ungar's opinions, the ALJ failed to explain how he considered the required factors, including the doctor's speciality (neuorology, not pain management as asserted), the length, nature, and extent of his relationship with Plaintiff, or the frequency of his examinations of him. *See* 20 C.F.R. §§ 404.1527(a)(2)(c)(2)(ii)(5) and 404.1527(c)(2)(ii)(5). Rather than give great weight or controlling weight to Plaintiff's treating source, neurologist Dr. Ungar, the ALJ gave greater weight to the opinion of an agency medical consultant, Shayne Small, M.D., who did not examine Plaintiff, much less treat him. For these reasons, the ALJ failed to support his assessment that Plaintiff can perform light work with only modest restrictions in his postural activities and workplace environment.

Plaintiff also argues that the ALJ erred in omitting any mental limitation from the RFC. The Commissioner argues that the ALJ supported his decision with substantial evidence. The record includes an examining psychologist's assessments of Plaintiff's anxiety and the opinions of two agency psychologists, who both reviewed the examining psychologist's report and agreed that Plaintiff's anxiety caused some moderate limitations in workplace functioning. The ALJ gave those opinions "little weight" because they were based on a single psychological exam and because Plaintiff reported greater functioning than was shown by the opinions and never sought mental health treatment. Although ALJs "are not bound by findings made by State agency or other program physicians and psychologists, [] they may not ignore these opinions and must explain the weight

12

given to the opinions in their decisions." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). The ALJ relied in part of Plaintiff's lack of treatment history but, as discussed above, did not discuss the reasons why Plaintiff failed to seek treatment, including his lack of insurance during the relevant period.

The ALJ also failed to incorporate in the RFC even the mild limitations in social functioning that he concluded Plaintiff experienced. While a mild, or even a moderate, limitation in an area of mental functioning does not necessarily prevent an individual from securing gainful employment, *Sawyer v. Colvin*, 512 Fed.Appx. 603, 611 (7th Cir. 2013), the ALJ must still affirmatively evaluate the effect such mild limitations have on the claimant's RFC. *See* § 404.1520a(d)(3); *Pepper v. Colvin,* 712 F.3d 351, 366 (7th Cir. 2013) ("After a "not severe" finding at step two, the special technique requires the ALJ to assess the mental impairment in conjunction with the individual's RFC at step four."). Here, the RFC only addressed Plaintiff's physical abilities and work environment and, without explanation, omitted any mental restrictions, despite the ALJ's own finding that Plaintiff had at least some limitation in social functioning. The ALJ's failure to account for Plaintiff's mild limitations social functioning is especially concerning here, where the VE found that a worker with Plaintiff's RFC could perform the job of order clerk in the food and beverage industry, a job requiring extensive interaction with the general public.

This matter is being remanded for a new analysis of Plaintiff's impairments at steps two and three to include consideration of his vertebral compression fractures, and, if necessary, a new RFC assessment at step four. On remand, the ALJ is directed to re-weigh the opinion of Dr. Ungar in accordance with the regulatory factors, and to fully consider the combination of all of Plaintiff's impairments, including his mental impairments, in assessing whether his impairments equal a listing

and, if necessary, in assessing his RFC.

## V. Conclusion

For the foregoing reasons, the Court hereby **GRANTS** the relief requested in Plaintiff's Opening Brief [DE 16] and **REMANDS** this matter for further proceedings consistent with this opinion.

SO ORDERED this 28th day of February, 2018.

                                              s/ John E. Martin
                                              MAGISTRATE JUDGE JOHN E. MARTIN
                                              UNITED STATES DISTRICT COURT

cc:    All counsel of record